Good morning, ladies and gentlemen. The first case on today's docket is the case of Mason v. John Boos & Company. And we have Mr. Terralisi for the appellant, and we have Thomas Dimash for the appellee and appellee west staff, and we have Julie Tuescher for, I take it for real-time staffing? I'm from John Boos & Company. I'm from John Boos & Company. Okay, and you both have divisory time and you're aware of that. Okay, you may begin. May it please the court and counsel, my name is Eric Terralisi and I represent the appellant, Clint Mason. The question presented by this appeal is whether a comprehensive and important regulatory act directed to the safety and health of employees operating as leased employees is absolutely meaningless or if it has some purpose whatsoever. Clearly, the act which was enacted in 1998 has been part of Illinois law at the time of this occurrence, 2007, nine years. Fundamental purpose, the stated purpose in the act itself is to assure coverage for leased employees, but secondarily in the legislative history that is part of the record in this case, perhaps even more important, to assure that appropriate premiums and coverages exist commensurate with the risk that the leased employee is going to take. And the reason why I say I think that's clearly the more important focus and clear focus of this act is that because prior to this act, clearly coverage was required. So simply restating that coverage, comp coverage, is required for a leased employee was simply stating the obvious, stating what had already been the clear established law. The real purpose was the concern of the legislature, as can be clearly evidenced from the legislative history, is that this was an artifact, a scheme, if you will, a device whereby bad companies, companies with bad safety records, companies involved in very dangerous businesses, could lease employees. They're not on their books as their employees at inappropriate comp rates. And, of course, the ultimate place where insurance, as we all know, is simply a pooling of risk and a spreading of the risk. If Part A is substantially lower than what they should be, if they're paying rates commensurate with an office worker when their employees are in factories with molding machines, with unguarded multiple moving blades, as was the case here, then another company has got to be making up that difference. And that's exactly what the legislative history indicates was the purpose of this act. The question is, does it mean anything whatsoever, or was it an absolute and total exercise of futility? And that is because the undisputed facts on this record, on the 619 motion to dismiss, was that Westaf had not registered some nine years after the passage of this act. Westaf, who was the employer of Mr. Mason, who leased Mr. Mason to Booz, had never registered under the act. Under the terms of the act, it, in fact, was unlawful for Westaf to even have been issued a comp policy in the first place. Under the act, had it registered, it would have been subject to numerous requirements, the first of which was to pay a $1,000 fee to the Department of Insurance to cover costs of audits. The department would have had a close oversight over Westaf and its comp policy. The policy had to be submitted to the department for approval, audits, and so on. None of that took place here because, of course, Westaf never registered. Now, and the crux of this appeal, and what we still, as we stand here today, do not have an answer to, is what does this act mean if the judgment of the circuit court is upheld, and the ultimate decision here is that both Westaf and its client, Booz, enjoy exclusivity immunity regardless of whether or not they have been issued a comp policy. And, actually, when you read the briefs here, the defendants appear to agree with me, and that is that this act is meaningless. Let me quote from defendant Booz's brief at page 14. It states, plaintiff contends that the legislature could not have intended the leasing act to be unenforceable. However, it is the plain language of the statute that remains the best indicator of the legislator's intent. Nowhere does the leasing act provide for penalties other than revocation of registration. You go on to the bottom of page 14. No criminal or civil penalties are provided for in the leasing act, and the Illinois Department of Insurance has power limited to revoking registration for those companies that fail to comply with the leasing act. Again, I agree that that is the sole remedy that the state of power, that the state has for a company that breaches its obligation to register. Well, how do you revoke registration of a company that never registered? I have a question. Were you saying or implaining that they would have paid a higher rate if they had been registered? Well, I think that's part of the problem, Your Honor, is that we don't know. We have no idea on this record whether they were paying an appropriate rate or not because they've not subjected themselves to any of the oversight of the act. The Department of Insurance doesn't know. It's not had an opportunity to prove these policies, to look at the rates, to conduct an audit, because Defendant Westath, which is clearly a large company, which I think we would have to presume knew what the law was for nine years before this action happened, willfully, intentionally chose not to register. And why would that be? Well, that would be because, according to their argument and the argument of Codefendant Booth, there's no consequence to complying with the act. That is a good point, Your Honor, because that's one of the arguments Westath itself makes in its brief at Page 10. It suggests, well, there's nothing on this record to indicate that we weren't paying that appropriate premiums commensurate with the risk for not being paid. And I agree. There is nothing in this record. And that's because we can't know, the trial court couldn't know, this court couldn't know, the Department of Insurance couldn't know, because they willfully refused to register. I wonder if the position of the defendants would be any different. But let us suppose, for example, that in 1998, when this law was passed, Westath, in fact, registered. And for eight years, they paid their $1,000 fee, they subjected themselves to the audits, to approval of their policies, and they decided they didn't like that. The Department of Insurance was making them pay higher premiums than they wanted. They liked the old days when they could lease an employee at office secretary rates, office worker rates, for somebody who's going to be working in a factory. So they decided to just quit paying their $1,000 fee, quit submitting themselves to audits. The Department of Insurance comes in and revokes their registration. And its response of Westath and their clients is, so what? What are you going to do to me now? You revoked my registration. The facts in 2007, when Mr. Boos essentially lost his, when Mr. Mason essentially lost his hand in this machine, would be absolutely no different between never registering in the first place and had their registration been revoked from direct noncompliance with the Act. And to suggest that our legislature intended to pass an Act of such a nature, which goes to health and safety and regulation of a very large industry, and to have it be absolutely meaningless, to be able to have that industry thumb its nose at the State, at the Department, and say, go ahead, have at it, it's not a thing you can do to me. Because even if you revoke my registration, even if I never register in the first place, absolutely nothing happens to me. And that's the argument of defendants. Yeah, that's right. Because that's what the statute says. All they can do is revoke me. I guess it would be analogous to ourselves, as license determines. If the statute said, if you don't pay your annual fee to the ARDC, your license to practice law can be revoked. And it was silent thereafter. And so you don't pay your fee, you continue practicing. There's no civil penalty, there's no criminal penalty, which we know there is for the unlawful practice of law. And so you keep practicing because the State is powerless to do anything. Now, this isn't just our position that exclusivity immunity is dependent upon compliance with the Act. It's not just pulled out a whole cloth out of the air. This statute specifically grants exclusivity immunity to both the loaning and the borrowing employer. Once again, this is something that predated the statute, that existed in the law. So to suggest that the legislature was just writing a sentence saying, oh, this is the law, this will continue to be the law, whether you abide by the statute or not, I think is very, very difficult to accept. The Act is prospective in nature only. It applied from, it was effective on the date it became law and applied to policies issued on and after its date. Clearly, that grant, that grant of immunity, which is actually, as pointed out in the briefs, a slightly different and slightly enhanced immunity over the prior common law immunity, because prior to the passage of the Act, the immunity of the borrowing employer depended upon the issue of the control test. That's taken out of the Act. So, in fact, this industry was granted something new, something enhanced. And to suggest that they not only kept the old immunities, but received these enhanced new immunities, take the benefit of the Act without taking in any burdens, I think really does border on absurd. I know that's an overused word when arguing against statutes. You can disagree with a statute. You can argue against it as far as on policy. But to suggest that a statute is utterly, totally, completely incapable of enforcement, I think is, in fact, really absurd. Now, the defendants here, to some degree, want to paint these pictures of the sky will fall if this decision of the trial court is reversed. I think that's clearly not correct here. This decision would apply only to employees who had been leased by companies that knowingly, willfully refused to register under the Act. Obviously, there's a two-year statute of limitations on PI cases. One would presume that in the last two years since this case has been filed, that West Death hopefully registered, although, again, if their position is correct, they had no reason to. Why would they pay $1,000? So there's no way that getting comp insurance is tied in with this registration? Absolutely it is, Judge. I'm talking about the oversight of that. Yes. No. I mean, that's a good point again. Counsel for Boos points out, well, let me... Page 15 of the Boos brief. Last paragraph. And it does, on its face. The problem is, it's totally unenforceable, as this case is proof of. In fact, they've been issued a policy, at least for the nine years between 1998 and 2007. As far as we know, they're still doing it today. So the suggestion that that's how you blend these two statutes together is to say, oh, the remedy is they can't even get a policy. Well, the facts hold onto that. The facts, undisputed facts, are that they have, they in fact have a policy. The question is, we don't know that any of the matters that the legislature was attempting to address were being complied with here. Whether premiums were being paid commensurate with the risk because they intentionally chose not to register, perhaps knowing, reading the statute, saying, there's not a thing they can do to us for doing that. Well, there is something that can be done, and I think the legislature did it. By coupling, otherwise, why even address the issue of employer immunity in this act? That was the law beforehand. The legislature, by passing this comprehensive statute and saying, okay, here's the statute, this is what you do, we want to make sure that this is done right. Not for you, but to make sure that it's a level playing field, to make sure that this isn't happening here, because ultimately there is a risk that if one, you know, if a good company is paying higher premiums, we're all aware of issues in the news about comp rates in Illinois. That can drive a company completely out of the state, and that's why this is an important statute, not only for the health and safety of employees, but from a business point of view, it's an important statute for good, safety-oriented businesses. Again, as we point out in our brief, a comp insurer who issues a policy to Westaf, they don't know from day to day whether the person is going to answer phones or dig coal, or as Mr. Mason here, risk losing their hand in a very, very dangerous machine. Just very briefly, well, I mean, one other point, and then I'll get on to the other issues that the defendants raise here, is that clearly an affirmance of the trial court here is a statement to the leasing industry that you can completely and utterly ignore this act. And I've been waiting since the day we filed this complaint to hear what the defendant's response is to that. Why would Westaf ever register? Why would any leasing company ever register if the plaintiff's position is not correct? And we still don't have an answer. And I challenge the defendants' counsel to give this court an answer. With respect to the other issues, I think they're adequately addressed in the briefs, particularly the issue of the release. It's clearly this release in the very, this comp contract in the very first sentence, restricts it to comp claims. The workers' comp commission has no jurisdiction to release any claims beyond that. And to the extent it's a private contract, it is clearly restricted to comp claims. We've cited numerous case law in our brief about how general language abroad release is restricted by the specific language. The specific language here is that to resolve a dispute over benefits payable under the workers' comp act, the very first sentence, clearly, as far as Westaf is concerned, that did not release comp law claims. As far as BOOS is concerned, it's not even a part of this release. And clearly, under the Contribution Act, a release of one tortfeasor does not release others. The election of remedies argument, again, is addressed in our brief. Essentially, that is that Mr. Mason didn't have an election here because there was comp insurance. You only have an election under the comp act against an uninsured employer. Then you can elect to have your comp law remedies or, even though they're uninsured, proceed under the comp act. Here, there was no election. There is no estoppel, and there clearly was no release. Thank you. Thank you. You'll have the opportunity for rebuttal. Thank you, Your Honor. Mr. Marsh? Thank you. Your Honors, may it please your Court, my name is Thomas Gamache. I represent the Appellee Westaf. The trial court, in this case, correctly held that the release language in the workers' compensation contract barred the instant action and that the exclusive remedy provision of the Workers' Compensation Act was not negated by the registration provision of the Employee Leasing Company Act. And, therefore, the exclusive remedy provision of the Workers' Compensation Act, in fact, barred the instant action. Counsel touched briefly upon the contract, the settlement contract and release language. I think that for Westaf's purpose, I think that's dispositive of Westaf itself. The general language that Appellate points to was the form language on the face of the workers' compensation contract. The release language is contained in the addendum release provision that was attached to the workers' compensation contract. There's no indication that one affects the other. The release language is crystal clear that this is to address any and all injuries, claims, damages arising out of the date of accident that was subject to the workers' compensation claim. This is the typical procedure that's done. I, frankly, have not seen a case where any court has held that release language contained as part of a settlement contract in workers' comp is limited to workers' compensation actions. I don't see any support for a jurisdictional argument that any release language contained in the workers' compensation contract is limited by the jurisdiction of the Workers' Compensation Commission. This is a contract between two consenting individuals, an individual and a company in this case. And I've seen nothing, and I don't think the briefs have suggested anything otherwise. And so to that extent, I think, like I said, as far as Westaf, I think that that issue of itself is dispositive. I do think that it's important to touch upon the Employee Leasing Company Act as it relates to Westaf as well. I'm not going to cry a chicken little, but I do think that the argument that the appellant is raising would have a profound effect on the workers' compensation industry itself. Before I touch upon that, I do want to point out that it has not been proved that the Employee Leasing Company Act would require Westaf in this case to register. The Employee Leasing Company Act carves out the temporary help arrangement as a type of business that's not subject to the registration requirement. While the evidence doesn't show that one way or the other whether Westaf falls under that, I think it's important to point out that this is not a guaranteed applicable statute to Westaf itself. Council goes into great detail about how this act would otherwise be futile and effective. I think that it's important to note, though, that when you are providing teeth to a statute, you have to find some support for where that teeth is. In this particular case, the provision that even references the exclusive revenue provision in the Employment Leasing Company Act does not show it as a condition that you have to register in order to get the exclusive revenue protection. It is clear on its face to expand the applicability of the exclusive revenue protection. Prior to that particular provision of the Employment Leasing Company Act, there was a control test under Cheney v. Getter that applied to whether or not a borrowing employer would be subject to the exclusive revenue provision. It's always been the case that the employer was. The Employment Leasing Company Act simply states that when the registration requirements of the Employment Leasing Act are complied with, we can do away with that control test approach, and we can extend exclusive revenue to both parties. There isn't any indication that, though, registration does, in fact, serve as a precursor to exclusive revenue protection pursuant to the Act. I think it's telling that in the years since the Employment Leasing Company Act was enacted in 1998, there really hasn't been any case law on the Act at all, and certainly not with respect to the exclusive revenue provision. Pointing to the legislative history, as Wes Staff did in the Appellee Brief, there is really no pointing out the exclusive remedy grant in the Employment Leasing Company Act at all, much less as the teeth for enforcement of this Act. The Employment Leasing Company Act is modeled after model legislation from the National Association of Insurance Commissioners, and similar legislation was enacted in a number of states, and at least the last time I checked, none of those states have held that failure to register under that state's legislation, otherwise void or limit the applicability of the exclusive remedy protection otherwise provided by the Workers' Compensation Act. I do think, like I said before, I do think that all of this silence is quite telling that this was not the intended result of the Act, that over the course of time, it was demonstrated that that's not what this industry could maintain. I think that it's important that this Act be acknowledged for what it is. It's a registration Act. I think that it perhaps lacks some teeth, but I don't think that this Court, I don't think that any of us here can legislate in teeth that don't exist. Why is it that the exclusive remedy protection, the voiding of the exclusive remedy protection should serve as that teeth? Where there's no support in the Act, that that be the case. If it be the case that an insurer, in deciding to extend coverage, can say, okay, well, this particular company would fall subject to the auspice of this Act, we will not provide coverage and we have an excuse to provide coverage. Well, that could be the teeth, but prohibiting the application of one of the cornerstones of the Workers' Compensation scheme, I think, is inappropriate. As we all know, when the Workers' Compensation structure was put in place, there was essentially an absolute liability for the employer, a no-fault system. In exchange for that, the employees, in fact, got less benefits for the types of injuries that they received. Less benefits than they would otherwise receive were they to be successful in circuit court, in civil litigation. To remove the sole protection that the employer has, this exclusive remedy provision, I think, destroys the foundations of the Workers' Compensation practice. To make such a broad jump, we don't find any support in the statute, the legislative history, the case law itself. In West Staff's brief, we pointed to the Illinois Institute of Legal Education analysis. As I mentioned before, the employees, somebody I'm dealing with, excludes the remedy, was intended to broaden the application, not constrict it. I think it's important to step back from the doomsday situation that Appellant points to. His client received payment. His client was paid. There was Workers' Compensation coverage. There has been no proof that the premiums paid by West Staff were inappropriate, were unreasonably low. Counsel asserts that the insurer of West Staff basically had no idea what the employees were doing. There is no proof to that extent. It's quite typical that with staffing agencies, be it temporary health agencies or employment leasing company agencies, it's quite typical that you'll have categories. You'll have office worker categories. You'll have industrial lineman categories. And the insurers will, in fact, know what categories these individuals will go to. But that doesn't affect the benefit payout. That doesn't affect the benefit payout. But the benefit payout is not what was contemplated by the Employee Leasing Company Act. The purpose of the Act was to ensure that good companies, safe companies, didn't pay more benefit, didn't pay more premiums than they should have by way of bad companies hiding their risks and liabilities, paying too little. As counsel indicated, the insurance industry is premised on spreading the risk and ensuring that the risk be maintained where it should be maintained. That's important. But the teeth doesn't exist to the extent that counsel has provided for, at least as it relates to the Employee Leasing Company Act. As I said, I think that this issue, as far as Westat is dispositive on the issue of the release provision in the workers' compensation contract, but I think that the exclusive remedy provision stands regardless of any registration obligations provided by the Employee Leasing Company Act. And I request that the finding of the trial court be affirmed. Thank you, Mr. Gamarra. Good morning. Good morning. Letitia, on behalf of John Bruce and Company. There are no factual disputes presented before this court. Plaintiff acknowledges that Westat was the lending employer, that John Bruce was the borrowing employer, that Mr. Mason filed a workers' compensation claim under the Compensation Act, that he settled that claim, that he was paid the benefits under that claim. He didn't have to prove fault to accept those benefits under the Compensation Act. So Mr. Mason took full advantage of his rights under the Workers' Compensation Act. There's no dispute here that that claim was fully and finally settled and paid. There's also no dispute as to the specific language of the Employee Leasing Company Act. First and foremost, with respect to Bruce and Company, the Act does not apply to it. Under its very terms, under Section 113-10, the Employee Leasing Company Act applies only to lessors of employees or to insurers. Bruce here was the borrowing company. It was the lessee. It was the client. The terms of this Act do not apply to John Bruce and Company. We also know from Section 113-5 of the Employee Leasing Company Act that the purpose of this Act was to ensure that employers were obtaining workers' compensation insurance for their employees so that if they were injured on the job, there was coverage available to them. From Bruce's perspective, what Bruce knew at the time that it brought Mr. Mason onto its premises from West Staff was that West Staff had a $1 million workers' compensation policy in place that provided workers' compensation coverage to its employees. That's because it had an advice of insurance form from West Staff that was proof of that type of coverage at the time Mason worked on its premises. The argument here is that the Employee Leasing Company Act doesn't apply to Bruce at all, that we are, in fact, one step removed from West Staff. We don't have to live by the terms of that Act. We're not subject to the terms of that. But secondarily, there's no provision in the Employee Leasing Company Act that requires this court to do what the plaintiff is asking it to do. There's no penalty in the Employee Leasing Company Act which says if you fail to register under this Act, lessors, you are denied the exclusive remedy provision  It's not there. If the legislature had intended that to be the penalty, it's not there. That's why the trial court, I believe, got it right here in the language that he used in rendering his decision, and I quote, There is no authority for the proposition of the failure of a lessor to register under the Employee Leasing Company Act invalidates any of the provisions of the Workers' Compensation Act including the exclusive remedy provision. It's simply not here. With respect to the remaining arguments under the Employee Leasing Company Act, I would adopt those arguments put forward by Mr. Gamache so I don't have to repeat those. Also, I believe that the release in this case does provide immunity for Booson Company as well. In the Raffke decision, that decision provides that when a release states that it is in full satisfaction of all of plaintiff's claims, it is not necessary to name each individual specific toward the leaser. And the language that we have in Mr. Mason's release stated that it was in, quote, full, final, and complete settlement of any and all claims of any nature whatsoever. I would submit to the court that that language is broad enough to cover the exception in the Raffke decision Other than that, I would stand on the arguments and agree with respect to both the election of remedies and judicial estoppel. And I believe that the trial court could have dismissed this complaint with prejudice on any of those bases independently. Therefore, I'd ask you to affirm the decision of the trial court. Thank you. Mr. Kelly, you can have the mic. Thank you. Let me read to the court verbatim the first sentence of this so-called release, which is actually the settlement contract one-sum petition in order. Quote, to resolve this dispute regarding the benefits due petitioner under the Illinois Workers' Compensation or Occupational Diseases Act, we offer the following statements. We understand these statements are not binding if this contract is not approved. And, of course, it had to be approved by the comp commission. We offer the following statements. The following statements include the entire rest of the lump sum petition in order and the attachment. Expressly, the very first sentence of the release drafted by counsel for West Staff states, to resolve the dispute over the benefits due petitioner under the compact. So, I think any argument that any subsequent language somehow, and there is any language that says notwithstanding anything prior, limiting this release to comp, we hereby release common law claims, any other claims. I think it would be analogous if if Mr. Mason had gone on to file a retaliatory discharge claim and they put this as release to that. You say, what are you talking about? I got $92,000 for losing my hand, my right hand, my dominant hand. And I read the thing that said to resolve the dispute over my comp benefits, I'm going to take $92,000 and you're telling me I released my discharge claim or if he had a contract claim, they didn't pay him for his vacation pay that was approved, that this would release all those claims. Well, it just, it doesn't. And it expressly says it doesn't. And it's clear, I mean, I think all case laws indicate that the point is what was the intent of the parties and the intent of the parties could not be made more clear by that initial statement of what this whole thing was about. With respect to again, the argument that that we have just invented this remedy or this connection between failing to register and exclusivity immunity, the statute specifically grants not only the lending employer, but the borrowing employee. So to that extent, it does apply to BOOS as the borrowing employer. Let me quote the language. Subject to any contrary provisions of the contract between the client and the leasing company, the employee leasing arrangement that exists, and this would be of course obviously only as of the effective date, this is quoting Section 113 slash 45 of the Act, the leasing arrangement that exists between an employee leasing company and its clients shall be interpreted for purposes of insurance, bonding, and employers' liability as follows. So it's saying henceforth, all contracts, all contracts will be interpreted as follows. And then one of the things it says is both will get this exclusivity immunity. Now to say, oh, thanks for the gift, we appreciate that, but we don't want to be burdened with any of these audits, we don't want to pay that thousand dollars, is I think again an argument that the legislature simply could not have intended. And once again, we stand here and the main question still has not been answered. What does this statute mean? What does this whole regulatory comprehensive statute mean if it can be completely ignored? And we have still not heard one thing from either defendant as to what in the world this statute could mean if the decision of the trial court is affirmed. Thank you so much.